THE REPUBLIC OF TEXAS VS. ABRAHAM SKIDMORE — Appeal from Red River County.

The doctrine of the domicile of the husband being that of the wife, or of the head of a family being that of the family, was not admitted in the construction of laws of colonization.

The object of the provision of the constitution granting lands to families and single men was the bestowal of a bounty on those only who were actual residents of the soil at that date.

This was a suit brought by the appellee, in 1842, to establish his claim to a headright for one league and one labor of land. The most material facts of the case will be found stated in the opinion of the court.

*Harris*, Attorney General, and *Morrill*, for appellant.

*Allen* and *Everts*, for appellee.

[262] Mr. Chief Justice HEMPHILL delivered the opinion of the court.

This cause was brought before the supreme court of the republic, and on the facts sent up in the record the judgment of the court below in favor of the petitioner was reversed, and the cause remanded for a new trial, in order that he might show, if he could, by additional proof that he was entitled to the amount of land sued for, or a less quantity.

The case is reported in Dallam, 581, and it appears from the facts then in proof, that the appellee came to Texas in February, 1836, and remained until June of the same year. He left, stating that he intended to return, and did so in April, 1839. Whilst here in 1836 he performed all the duties incident to a good citizen. Upon his return he laid claim to a selection of land made by him in 1836; when he left in 1836, he left with the intention, as stated by himself, of going for his family; and upon his return he brought his wife and children with him. He also proved by two other witnesses that at the date of declaration of independence he was a married man and the head of a family, and it was proven that they were residing at that date in Alabama, in the United States of North America.

The questions presented by these facts were maturely considered by the court, and in the lucid opinion delivered by Judge Baylor, it was held "that to make a man a resident citizen within the meaning of the constitution, he must have resided at the date of the declaration of independence within the republic with the *intention* of remaining, and that if he left it, he must have quitted the country with the *intention* of returning, and that the claim of the appellee, tested by these principles, could not be supported.

"That Skidmore's long absence from the country, which was totally unaccounted for, with the fact that his home, family and property were in Alabama during all that time, lead us irresistibly to the conclusion that he had not at the date of the

(237)

declaration of independence made this country [263] his residence *animo manendi*, and that when he left it he did not do so without the certain intention of returning, and that the equivocal conduct of the claimant relative to his *inhabitancy, intention of remaining*, and *returning* to the country, would not entitle him to the liberality of the republic." Dallam, 582.

On the second trial there was additional proof adduced by the claimant and by the republic, and a second verdict was found for the appellee. We are of opinion that his long absence from the country was accounted for satisfactorily by the facts adduced in evidence; and that his acts after his return to Alabama demonstrated an intention to change his domicile.

There were some contradictory statements relative to the patriotism of the expressions and conduct of the applicant in the spring of 1836. As the jury were the best judges of the weight to be given to these statements under all the circumstances, we will make no comment upon them, nor will they enter into our consideration further than as they show that the claimant cannot be classed among the officers and soldiers whose families did not emigrate with them to the country, and for whom special provision was made by the 30th section of the law of 1837.

Is the claimant, on the facts now presented, entitled to a league and labor of land, under the laws regulating the grant of certificates for headrights?

We have repeatedly decided at the former term of this court, that the jurisdiction of the district court to hear and determine claims for land was a special and limited authority, restricted to the admission of such claims alone as could be established by the number of witnesses and the facts positively prescribed by the law. And that where all the requisites pointed out in the statute are not complied with, no case is presented for the exercise of the jurisdiction originally vested in a board of land commissioners and subsequently in the district courts. And their acts confirming [264] claims on any other facts or circumstances than those distinctly defined in the statute are usurpations of power not warranted by the law of the land.

A grant of a certificate for a league and labor to an emigrant who had arrived in the country five years after the declaration of independence would be a flagrant usurpation obvious to all. And a grant to one who had arrived five years before the declaration of independence, but whose application was not sustained by the oath, the number of witnesses and the facts prescribed by the law, would be also usurpation, not so glaring and obvious to common comprehension as the former, but equally unsanctioned by the authority of law. The jurisdiction is not dependent on the supposed merits or hardships of the case of the applicant, but upon the establishment of the facts and compliance with the requisites prescribed by the statute. The claimant must prove that he was actually a citizen of Texas at the date of the declaration of independence, and continued to be such up to the time of his application for the certificate, and must prove, also, whether he was married or single at the time of the declaration of independence.

The appellee has proved that he was in Texas at the date of the declaration, and that he was a married man, but that his family was then residing at his former domicile in a foreign country.

What are we to understand by the signification of the terms a "married man," as used in the statute, or "head of a family," as found in the constitution? Was it the intention of the framers of these instruments to dispense a bounteous munificence out of the public domain to or for the benefit of foreign families, or to place claimants who had families on the soil on no higher footing than those whose families were still residing in foreign regions more or less remote, and who might possibly, in the progress of human events, abandon their then existing domicile and transfer themselves to the territory of the new republic?

[265] This construction is inadmissible and is repugnant entirely to the sense in which such terms used in the laws of colonization were understood, and to the whole scope, nature and objects of the grant.

The obvious common sense meaning of the terms is the one in which they should be understood. The members of the

convention and of the congress were familiar with the received construction of similar phraseology under the laws of coloniza-tion, and under such construction the actual presence of the family in the country was an indispensable condition which must precede their admission as colonists or settlers, and a grant of land to them in that capacity.

The doctrine of the domicile of the husband being that of the wife, or of the head of a family being that of the family, was not admitted in the construction of the law of colonization. They were incompatible with the object and purpose of the grants, which were to induce and reward actual settlements in the country, and of which on their abandonment of the terri-tory the beneficiaries were totally deprived. The object of the provision of the constitution granting lands to families and single men was the bestowal of a bounty on those who were actual residents of the soil at that date, and was neither in the terms or spirit of the provision dependent on the possible future introduction of their families. The constitution de-clares that "all persons (Africans, the descendants of Africans and Indians excepted) who were residing in Texas on the day of the declaration of independence shall be considered citizens of the republic, and entitled to all the privileges of such." Having by this declaration naturalized all residents of what-ever age or sex, the further declaration is made that "all citi-zens now living in Texas, who have not received their portion of land in like manner as colonists, shall be entitled to their land in the following proportion and manner: Every head of a family shall be entitled to one league and labor of land, and every single [266] man of the age of seventeen and upwards shall be entitled to one-third part of a league of land."

These provisions are plain and easily understood. They refer obviously to families and single men, citizens and resi-dents of Texas. If the phrase "every head of a family shall be entitled to one league and labor of land" can be dissevered from its connection with the context, and construed without reference to the subject matter and object of the grant, so may the phrase "every single man of the age of seventeen and up-wards shall be entitled to the third part of one league of land"

be construed in like manner, and the actual residence of either class of claimants might not be deemed an indispensable ingredient in support of a claim derived through this provision of the constitution. It is unnecessary, however, to attempt an illustration of the meaning of terms which cannot be easily misunderstood.

The 12th section of the law of 1837 requires the applicant to prove that he was an actual citizen of Texas at the date of the declaration of independence, and that he was a married man at that date, if the claim be for a league and labor of land.

This provision prescribes the facts to be established to sustain claims founded upon the above recited provisions of the constitution, and neither from its terms or those of any other section of the statute can we infer the remission of the constitutional requisite of residence on the soil at the date of the declaration, nor is any exception made except in favor of the families of officers and soldiers.

By the 30th section of the act it is declared that all officers and soldiers who engaged in the service of Texas previous to the 1st of March, 1837, whose families are now here, or may arrive within twelve months from the date of their discharge, shall be entitled to the same quantity of land they would have been entitled to if their families had emigrated to the country with them.

It is an acknowledged rule of interpretation that " an exception [267] strengthens the force of the law in cases not excepted," and the implication arising in favor of the general rule of the law from the exception acquires additional force when it is consistent with the subject matter, the scope and design of the statute.

The legislative department of the government, having authority to regulate the disposition of the public domain, must have regarded the presence of the family in the territory at the declaration of independence as requisite to the support of a claim under the above provisions of the constitution and the 12th section of the land law of 1837; and therefore by special exception officers and soldiers were excepted from the other-

wise uniform rule, and were declared to be "entitled to the same quantity of land as if their families had emigrated to the country with them." The terms of this provision show very clearly that in the opinion of congress a head of a family would be entitled to more or less land, as the circumstance might be of his family emigrating or not emigrating with him to the country.

The late supreme court in the case of the Republic of Texas v. Wm. Young, Dall. 464, departed to some extent from what appears to be the more obvious meaning, and what had been the practical construction of the provision of the constitution and of the statute; and in conformity with what was conceived to be the spirit of legislation on the subject, they sanctioned a claim where, although the family was not in the country at the date of the declaration of independence, yet preparatory arrangements had been made for their final removal, and their former domicile had been abandoned before that period.

The applicant in that case showed that he had before leaving Mississippi sold his real and all his personal estate that he could not conveniently transport, with the intention of becoming a resident citizen of Texas; that he abandoned his domicile in Mississippi in the month of January, 1836, and acquired a new one in the county of Bowie in the month of [268] February of the same year; that his family continued in Mississippi, until the month of October in the same year, visiting their relations, but without any domicile or place of residence.

On these facts the claim of Young to a league and labor of land as a resident citizen and head of a family at the date of the declaration of independence was sustained; and it is not our intention to depart from the rule established by that decision, in cases where the claim is made under a similar state of facts and circumstances. There is a marked difference, however, between the case of Young and the one now under consideration.

In the former the property had been sold, the domicile abandoned, and the family left with their relations before the departure of the applicant from Mississippi. He had no dom-

icile until he established himself in Bowie county, and on its acquisition, that became his sole and exclusive domicile.

From the record in this case it does not appear that Skidmore, before his leaving Alabama originally, had manifested by acts or words any intention of removing elsewhere, or of becoming a citizen of Texas; that he had made any disposition of his property, or arrangements preparatory to a subsequent removal; or that even his family had any knowledge of his intention to place himself within the pale of a foreign government.

The evidence of Thomas Skidmore is, that when the appellee returned to Alabama in 1836, he stated that "his residence was in Texas, and commenced settling his business preparatory to a return," etc.

This shows no previous abandonment of the former domicile, or arrangement for a change of the residence of his family until his return from Texas. It is not shown that he had no other domicile at the date of the declaration of independence than the one in Texas; and he is not therefore entitled to the aid of the rules on which the decision in the case of Young was founded.

[269] The cause will again be remanded for a new trial, as the appellee may possibly be able by further proof to establish facts similar to those which characterized the claim of Young, and without which the application could not have been supported. For the rules and principles which must control the courts in their decision on claims for land, see the cases of The State v. Manchach, 1 Tex. 586; The State v. Casinova, 1 id. 401; and Grooms v. The State, 1 id. 568, decided at the last term.

It is ordered that the judgment of the court below be reversed, and the cause remanded for a new trial.