F. M. HILL ET AL. V. SUSAN MOORE.

No. 7170.

1. **Cases Adhered to.** — Hall v. Wootters, 54 Texas, 231, and Barker v. Swenson, 66 Texas, 407, adhered to.

2. **Stale Demand—Coverture.**—Coverture will defeat the plea of stale demand when pleaded against an equitable right asserted by a married woman. Reed v. West, 47 Texas, 248.

3. **Headright for League and Labor—Family.**—A headright certificate for a league and labor of land issued in 1838 imports on its face that it could only have been granted by reason of the existence of a family of which the grantee named therein was a member and the head.

4. **Family — Marriage — Discussion of Statutes.** — See discussion of laws of Spain, of Mexico, and of Republic of Texas, touching land grants to heads of families. The marriage relation in all the laws seems to have been regarded as the basis upon which the family stood.

5. **Same.**—The framers of the colonization laws used the word *family* when used as the criterion by which to determine how much land should be granted to one person as based upon the marriage relation, the husband the head.

6. **Grants to Head of Family.**—That grants of land made prior to the colonization law of March 24, 1825, in a few instances were held valid when granted to a group of single men, calling themselves a family, or to a man and woman living together but not married, can not be relied upon as conclusive that the former government ever recognized a collection of single men as a family under the law of March 24, 1825. Conceding that valid land grants have been so made since said act, and still such facts would not divest the idea of a family as a relation having marriage for its basis.

7. **Headright League and Labor Land Certificate—Notice.**—The headright league and labor land certificate issued February, 1838, to Jowell, gave notice to all persons that persons other than the original grantee might have an interest in it, and that it could not have legally issued to him but for his relation to some other person.

8. **Same—Notice to Purchaser.**—A purchaser of a headright league and labor land certificate stands charged with notice of the fact that the headright was community property of the grantee and his wife, of her death, and of existence, etc., of her child, etc., in absence of testimony showing that such inquiry as a prudent man ought to make failed to develop the facts as they existed.

9. **Adjusting Equities — Location of Land by Part Owner.** — A league and labor certificate was issued to Jowell. The vendor of appellee pur-

chased under Jowell, after his wife's death, a part interest in the certificate, and located it, and patent was issued. Subsequently the vendor bought of Jowell the remaining part of the league. Certificate for unlocated balance was issued, and it was not shown what disposition was made of it. Heirs of Jowell's wife sued for the wife's interest in the land which had been located and patented. In adjusting equities, *held:*

1. If no use was made of the unlocated balance of the certificate, then defendant (appellant) should recover the half-league interest, and heirs of Mrs. Jowell the remainder.

2. If the unlocated balance certificate has been located, and land acquired thereby, then the defendant would in partition be entitled to half-league interest, to be taken pro rata from both surveys.

3. If the unlocated balance was sold, then defendant should recover but half the survey in litigation.

4. The vendor of defendant having in good faith secured the land, she should be allowed the reasonable cost of procuring title to so much of the land as may be recovered, and with interest; also the taxes paid upon the lands recovered, with interest.

ERROR from Denton. Tried below before Hon. F. E. PINER.

*Sawnie Robertson,* for plaintiffs in error.—1. The certificate by virtue of which the land in controversy was located was the common property of R. R. Jowell and Martha P. Jowell. Const. Republic of Texas, sec. 10, Gen. Prov.; Burris v. Wideman, 6 Texas, 232; Parker v. Chance, 11 Texas, 517.

2. R. R. Jowell sold, after the death of his wife Martha P., without authority of law. Sanger v. Moody, 60 Texas, 96.

3. Neither defendant nor any one of those under whom she claims, was an innocent purchaser without notice of the right of the daughter of Martha P. Jowell, and of plaintiffs, the heirs of said daughter. Const. Republic of Texas, sec. 10, Gen. Prov.; Act Cong. Republic, Dec. 14, 1837, secs. 11, 12; 1 Sayles' Early Laws, 262; Hill v. Moore, 62 Texas, 610; Merrill v. Roberts, 64 Texas, 441; Edwards v. Brown, 68 Texas, 329; Daniel v. Bridge, 73 Texas, 149; Dodge v. Litter, 73 Texas, 319; Gaston v. Dashiell, 55 Texas, 508; 2 Pome. Eq., sec. 626, et seq.; Johnson v. Harrison, 48 Texas, 268.

4. The plaintiffs' suit is not barred by limitation or laches, nor is their demand stale. Reed v. West, 47 Texas, 240; Merrill v. Roberts, 64 Texas, 441.

5. This suit is not barred by two years adverse possession of the certificate. Barker v. Swenson, 66 Texas, 407.

6. The plea of former suit by plaintiffs and judgment against them presents no bar to this suit. Hall v. Wooters, 54 Texas, 231; Sanchez v. Ramirez, 58 Texas, 310.

7. The defendant can recover neither in money nor land for services

rendered by Duren and Moore in locating plaintiffs' half of the certificate. Powell v. Thompson, 66 Texas, 230.

*Alexander, Winter & Campbell* and *J. M. Moore*, for defendant in error.

1. Whether the certificate was community property or not is not material, because in any event the title of plaintiffs was equitable; and the defendant's testator having acquired an equity of equal dignity by purchase for value without notice, and drawn to himself the legal title, plaintiffs can not recover. Hill v. Moore, 62 Texas, 610; Edwards v. Brown, 68 Texas, 329; Wimberly v. Pabst, 55 Texas, 587; Webb v. Webb, 15 Texas, 275; Wilson v. Wall, 6 Wall., 90; Lea v. Copper Co., 21 How., 493.

2. If the fact that the certificate was Jowell's headright was notice of any fact, it was notice simply that he was the head of a family; and as he sold at a time when he was the head of a family, composed of himself and a wife as one constituent thereof, the purchaser acquiring title in ignorance of the existence of the first wife is protected. Burch v. Carter, 44 Ala., 117.

3. The fact that the certificate by virtue of which the land was located can not, at the outside, be held to be any more than a circumstance sufficient to put the purchaser on inquiry, and if an unavailing inquiry was made, or if the facts show that reasonable inquiry would not have availed, the purchaser must be protected. Dodge v. Litter, 73 Texas, 322; Story Eq. Jur., sec. 400, note 3.

4. If the fact that the certificate was a headright put the purchaser on inquiry, after this lapse of time, and in view of the death of all parties by whom the proof of inquiry could be made, the presumption will be raised that proper inquiry was made without avail. Veramendi v. Hutchins, 48 Texas, 531; Mueller v. Engylkn, 12 Bush (Ky.), 444; Boggs v. Barner, 6 W. & S., 472.

5. While stale demand, as technically understood, may not apply in this case, still by reason of the lapse of time and the death of those best acquainted with the facts, equity will indulge presumptions in bar of plaintiffs' demand. Veramendi v. Hutchins, 48 Texas, 531; Mueller v. Engylkn, 12 Bush (Ky.), 444; Boggs v. Barner, 6 W. & S., 472; United States v. Beebee, 17 Fed. Rep., 36.

6. The suit is barred by the two years adverse possession of the certificate. We recognize that Barker v. Swenson, 66 Texas, 407, is adverse to our proposition, and will not discuss this matter without invitation by the court, further than to suggest that the conclusion reached in that case is contrary to the necessary logical deduction of a number of preceding decisions of the Supreme Court, and that the conclusion therein was a surprise to the profession.

7. The location having been for joint benefit, by a tenant in common

of the certificate, the expense of location must be shared by all, and equity on a partition will require contribution by plaintiffs. Story Eq. Jur., sec. 505; Freem. on Coten., sec. 322; 2 Desty on Tax., 936, "Tenants in Common."

STAYTON, CHIEF JUSTICE.—This case was before this court at a former term, and is reported in 62 Texas, 610.

The material facts are as follows:

" R. R. Jowell and Martha P. Ragsdale married in Texas in 1835. They lived together in said State as husband and wife, in Cherokee County, until the death of Martha, in the fall of 1848. Her husband and one child (Mary Ann, born October 20, 1836) survived her. Mary Ann married F. M. Hill, February 12, 1852, and died March 10, 1872, leaving as her heirs her said husband, F. M. Hill, and the other plaintiffs in this suit—George R., born in 1857, Richard D. in 1860, Lucinda F. in 1862, Sallie A. in 1866, and John M. in 1870, children of F. M. and Mary Ann. At the death of Martha P. the community estate of herself and her husband owed no debts. She owned some slaves in her right, and she and her husband owned as community property the land certificate by virtue of which the land in controversy was patented. The said certificate was a headright certificate for one league and labor of land, issued in February, 1838, by the Republic of Texas, through the Board of Land Commissioners of Sabine County, Texas, directly to the said R. R. Jowell. The said R. R. Jowell never qualified as community survivor, nor was the estate of said Martha P. administered upon.

" On December 17, 1852, the said R. R. Jowell sold and conveyed said certificate, less 640 acres, to George W. Copeland. On November 9, 1854, George W. Copeland conveyed said certificate, less 640 acres, and lot D, to Jesse Duren. On May 26, 1856, R. R. Jowell conveyed the entire certificate directly to Jesse Duren; and on October 16, 1856, the said Jesse Duren conveyed the said certificate and the land in controversy, upon which it had then been located, to George F. Moore, for the sum of $3000 in money to him paid by the said Moore, that being the full value of the property at the time. Certified copies of said transfers are made part hereof.

" That said Moore, soon after he had purchased, caused an error in the survey to be corrected, and applied for and obtained a patent to himself as assignee, dated November 29, 1856; that at the time of his purchase and the issuance of said patent the said Moore lived in Travis County, Texas; was a lawyer by profession, in practice, and had no actual knowledge of any defect in his title, or of any claim of Mary Ann Hill or of these plaintiffs, either to the certificate or to the land in controversy. That the defendant in this suit is the surviving wife of said George F. Moore, and the sole devisee of said Moore's estate in said land in con-

troversy.   That said R. R. Jowell received and applied to his individual uses the proceeds of sale by him of said land certificate, and neither the said Mary Ann nor any of her heirs, nor the plaintiffs, ever received anything from the community estate of said R. R. and Martha P. Jowell.

" That the heirs of said Mary Ann Jowell commenced suit against George F. Moore on the — day of May, 1876, in the District Court of Denton County, said suit being numbered 1178 on the docket of said court, which was prosecuted to final judgment on the merits, said judgment having been rendered against the plaintiffs in said suit less than twelve months before the commencement of this second action.   From the date of patent to the date of trial the said George F. Moore and defendant have paid all taxes upon said land, aggregating the sum of $1203.70, and interest at 8 per cent on said taxes per annum from payment amounts to $860.81.

" The balance of said certificate not located on the land in controversy, and bought by said George F. Moore, was never received by Mary Ann Hill or her heirs.   That said certificate was located on the lands in controversy by Jesse Duren at his own expense, and the expenses of obtaining a patent were paid by said George F. Moore.   The usual price of locating a certificate at the time of the location of the land in controversy was 12 to 20 cents per acre, or one-fourth to one-third of the land. That after the death of Martha P. Jowell, R. R. Jowell married Eliza Hagen, in 1850; said Eliza was living in Cherokee County in 1876.   R. R. Jowell died in 1871.   Jesse Duren is dead (died in 1881 or 1882), and G. W. Copeland is dead.   That neither F. M. Hill nor any of the children of Mary Ann Hill ever received anything from the estate of said R. R. Jowell."

This is the agreed statement of the material facts.

Plaintiffs seek to recover one-half of the tract of land in controversy, which it will be observed does not embrace all the land that might be granted by virtue of the certificate.

The defendant answered by general demurrer, plea of not guilty, plea of stale demand, two years limitation by possession of certificate, payment of taxes by defendant, location of land, and payment of all expenses by defendant and those through whom she claims, and also plea of former recovery by George F. Moore, who devised the land to defendant.

The cause was tried without a jury, and judgment was rendered for defendant.

That the plea of former recovery was not available in this cause is evident.   Hall v. Wooters, 54 Texas, 231.

It is equally evident that title to the certificate was not acquired by adverse possession of it for two years.   Barker v. Swenson, 66 Texas, 407.

When R. R. Jowell attempted to sell the land certificate, the only child

of his deceased wife was a married woman, and so continued until her death in 1872, while the former action was brought in less than five years after her death.

At the time of her death all of her children were minors; and taking the conceded facts as true, there is no reason to believe that by lapse of time evidence was lost by which appellee has been prejudiced in illustrating her right, or that any advantage has been gained by appellants through delay.

When the original action was brought parties to the transaction were alive, who probably could have testified to any important fact, and the inference is, that when the former action was tried the facts, then agreed to as are they now, were susceptible of proof.

In Reed v. West, 47 Texas, 248, it was said: "Surely it can not be doubted that during the suspension of the statutes of limitation equity will follow the law, and will not, unless it be for some equitable reason, hold a complainant guilty of laches because of his failure to file his bill during the interval. There was nothing in the circumstances of this case, as disclosed in the pleadings, to justify holding him to greater diligence than is required of parties suing on strictly legal demands."

If other suspensions of limitation be considered on question of stale claim, surely coverture must be; and in many cases both infancy and coverture have been deemed a sufficient answer to make a plea. Wilson v. McCarty, 55 Md., 283; Black v. Whitall, 9 N. J. Eq., 589; Dugan v. Gittings, 3 Gill., 138; Demarest v. Wynkoop, 3 Johns. Ch., 129; McMillan v. Rushing, 80 Ala., 406; Dragoo v. Dragoo, 50 Mich., 573.

It is not necessary, however, in this case to decide whether the same effect should be given in all cases to coverture, when set up to defeat a plea of laches or stale claim, as must be to that fact when set up to avoid the statutory bar, based on lapse of time; but it would seem that this ought to be done if the defense be based solely on lapse of time.

The cases in which it may be supposed to have been held that the same rule as to disabilities, and as to time within which suits must be brought, does not exist in equity as at law, must probably mean nothing more than that the lapse of a long time after cause of action accrues before suit is brought is a fact from which inference of want of right may sometimes be drawn, which could not be indulged if suit had been brought promptly, and thus the lapse of time assist to reach the conclusion that the right in fact never did exist, rather than to have intended to hold, in the face of statutes declaring what disabilities shall operate to prevent bar, that any court has power to deny to such statutes their full effect, when presented in an equitable proceeding as well as when arising in actions strictly legal in their natures.

Inferences of acquiescence may also be drawn from long delay in the assertion of a known right, and in extreme cases estoppel may grow up;

but we are of opinion, looking to the coverture of the mother of appellants, and to all the other facts before us, that no such inferences can be drawn in this case, and that their claim is not stale. That the land certificate was community property is a conceded fact; that no facts existed which authorized the survivor to sell is also conceded, as is it that no facts have transpired since the sale which would preclude plaintiffs from asserting their rights in the land in controversy; and the real question in the case is, were any of the persons through whom appellee claims title innocent purchasers?

The certificate upon its face showed that it was one that could only be granted by reason of the existence of a family of which R. R. Jowell was a member and the head, and the conveyances showed that he was a colonist.

The facts in connection with the laws in force when the original certificate issued, evidence that the right was based on section 10 of the General Provisions of the Constitution of the Republic, which provided, that "All citizens now living in Texas, who have not received their portion of land in like manner as colonists, shall be entitled to their land in the following proportion and manner: *Every head of a family* shall be entitled to one league and labor of land, and every *single man* of the age of seventeen and upward shall be entitled to the third part of one league of land."

This is perhaps the first law in which the words "head of a family" were used in reference to the grant of lands, and may furnish the reason for the subsequent use of the word "headright;" and in it are found the broad distinction between single men, which could mean nothing less than unmarried men, and those who were heads of families. The same section maintains the same distinction as to augmentations, but the words "head of a family" are not here defined, and the earliest construction placed upon that section of the Constitution is probably found in the twelfth section of the Act of December 14, 1837. Pasch. Dig., art. 4140. That act created a Board of Land Commissioners, whose duty it was to investigate claims for land, and to issue certificates to such as under the law were found entitled; and it applied to the claims of those who were entitled to lands under the colonization laws, and to those who were entitled by reason of residence at the time of the declaration of independence. Persons thus claiming were required by the act to prove "by two or more good and credible witnesses, as the commissioners may require, that they were actually citizens of Texas at the date of the declaration of independence, and have continued so to the present time; and they shall also be required to prove in like manner whether they were *married or single* at the time of the declaration of independence, and what amount of land they were entitled to under the law."

In The Republic v. Skidmore, 2 Texas, 265, it was held, that "the

twelfth section of the law of 1837 required the applicant to prove that he was an actual citizen of Texas at the date of the declaration of independence, and that he was a married man at that date, if the claim be for a league and labor of land;" and in the same case it is evident that the court understood the words "married man," used in the statute, to have the same meaning as the words "head of a family," used in the Constitution.

The act referred to further provided for the issuance of such certificates to widows and orphans, and to purchasers as assignees, thus again recognizing the fact that marriage was the basis for the family recognized by the Constitution.

In the twenty-third section of the same act it was provided, that "all *single men* who were in the Republic at the date of the declaration of independence, and entitled under the Constitution to one-third of a league of land, and who have *since married*, or *may marry* within the next twelve months, shall be entitled to the additional quantity of two-thirds of a league and labor of land," thus again showing that the family deemed to be entitled to a grant of a league and labor of land was a family based on marriage.

The twenty-ninth section of the same act evidences the same intention in reference to smaller grants that might be made under its provisions.

If we look to the several colonization laws, it will be seen that where families were mentioned was meant a collection of persons having association by reason of marriage.

The imperial colonization law spoke only of families as the recipients of the empire's bounty, and declared that all foreigners who established themselves in the empire should be deemed naturalized if they should exercise any useful profession or industry, by which at the end of three years they had a capital to support themselves with decency, "and are married;" and that persons so qualified should acquire particular merit for "obtaining letters of citizenship if they married Mexicans."

The national colonization law required the several States of the Mexican Republic to pass colonization laws, and in pursuance of this the Congress of Coahuila and Texas framed a law under which persons acquired such rights as were recognized by the fifteenth article of the provisional organic law of the Republic of Texas, as well as by the section of the Constitution of the Republic before referred to.

Under that law, before a foreigner then here could be deemed domiciliated, it was necessary for him not only to declare such to be his intention, but also to register his name and those of his family, if he had any, with a statement, among other things, whether he was married.    Pasch. Dig., art. 565.

This law contemplated the introduction of *families*, and made the compensation of empresarios to depend on the number of *families* introduced

and established. Pasch. Dig., arts. 570, 574, 575. It declared how much land should be granted to *each family*, but did not declare who must be the constituents. Pasch. Dig., art. 576.

The two succeeding articles of the law, however, show that the law makers had in their minds the family formed by marriage. The fifteenth article of the law provided, that "*unmarried* men shall receive the same quantity [as a family] on *marrying*, and foreigners who *marry natives* of the country shall receive one-fourth more; those who are *entirely single*, or who do not compose a part of any *family*, contenting themselves rather with the fourth part of the quantity aforesaid, which shall be computed to them on the assignment of their land."

The sixteenth article provides, that "*families* and *single men* who, having emigrated separately and at their own expense, shall wish to annex themselves to any of the new settlements, can do so at all times, and the same quantity of land shall be respectively assigned them as specified in the two foregoing articles; but should they do so within the first six years from the establishment of the settlement, one labor more shall be granted to families; and *single men*, instead of one-fourth, as specified in article 15, shall receive one-third."

As said in Edwards v. James, 7 Texas, 380: "Generally throughout the colonization law the word family is used in contradistinction to a single or unmarried man. * * * The husband is, by law and courtesy, esteemed the head of the family; and this is said, by Spanish jurists, to be owing to his greater force, prudence, and aptitude."

It is thus seen that with the framers of the colonization law the word family, when used as the criterion by which to determine how much land should be granted to one person, had always uppermost in their minds the family whose foundation was marriage.

It was to secure the rights of all who, under the colonization laws, had become entitled to land, or who, not being so entitled strictly, were residents at the time of the declaration of independence, that section 10, General Provisions of the Constitution of the Republic, was adopted; and in the first law enacted to give effect to that provision we find the fact of marriage or no required to be proved as a means for determining the quantity of land to which the applicant was entitled.

These several constructions correspond with the popular or ordinary meaning of the word family, although such is not the sense in which it is always used.

If we look to the laws in force when the right of Richard R. Jowell to a league and labor of land accrued, to the situation of Texas, and its relation to the Mexican nation, the strongest reasons are shown why it was the desire of the Mexican nation that the family on whose account a league and labor of land was granted should be a family formed by or the result of marriage.

Foreigners were invited, and the presence in the country of the wife and children of an immigrant was the highest pledge of fidelity to the nation that could be given; and such was the solicitude felt upon this subject, that more land was granted to an immigrant who married a native than to others.

This was perhaps deemed not only a further pledge of fidelity, but also a guaranty that immigrants, with their offspring from such marriages, would become in feeling as in name Mexican citizens.

The great mass of those who received grants for a league and labor of land prior to the declaration of independence, or under the provisions of the Constitution of the Republic, were the heads of families, composed of husband and wife, or of one of those and the offspring of their marriage; but it is claimed, because this was not universally true, that the fact that the certificate issued to Richard R. Jowell ought not to be held sufficient to put a purchaser from him on inquiry as to right of the mother of appellants.

In Hardiman v. Herbert, 11 Texas, 656, it appeared that a grant was made in Austin's Colony to two single men as a family, and the grant was sustained on the ground that the authorities of the former government had passed on the capacity of the grantees to take such a grant, which was held to be conclusive; but in disposing of the case this court said: "If it were an open question, now for the first time to be determined, we might feel no hesitancy in deciding that two single men did not constitute a family, in the proper acceptation of that term."

In the case of Marsh v. Weir, 21 Texas, 97, it appears, that under Austin's first contract, which was made prior to the enactment of the colonization law of Coahuila and Texas, a grant was made to Marsh for a league of land, when in fact it was for the benefit of himself and three other single men, and that under that contract, and prior to the passage of the colonization law for Coahuila and Texas, this course was pursued in that colony.

The court thus states the matter: "The plaintiff's evidence, improperly excluded, establishes very satisfactorily that although the original grant of the 8th of July, 1824, was made ostensibly to the plaintiff as the head of a family, yet he received three-fourths of it in trust for McCormick and the others who constituted the family, and that he was in fact the grantee of but one-fourth of the league. McCormick was in fact the grantee, as a colonist, of the one-fourth now claimed by the defendant in his right, and the plaintiff was but an instrument by which the government transmitted to him the title." From the testimony offered in that case, this course seems to have been pursued on account of the doubt as to the right, under that contract, to make grants for less than a league, and on account of the unwillingness of the empresario to grant that quantity of land to a single man.

The grants in the two cases referred to were both made before the passage of the colonization law of Coahuila and Texas, which clearly prescribed the quantity of land that should be given to a family and to a single man, and they can not be looked to as decisions that the authorities of the former government ever recognized a collection of single men as a family under the law of March 24, 1825.

It seems to have been held that a land certificate for two-thirds of a league and labor, issued by a board of land commissioners to a person who had before received one-third of a league, was valid, although the person had no family other than three slaves. The State v. Sullivan, 9 Texas, 156.

In Hatch v. Dunn, 11 Texas, 708, it was held, in accordance with a long line of decisions, that the acts of the officers of the former government would be deemed conclusive as to the capacity and right of a person to take what was granted to him, and the decision was based on that proposition; although the court does say, and we do not controvert its correctness, that "it is not believed ever to have been considered necessary, to entitle the applicant to lands as the head of a family under the colonization laws, that he should have had a family consisting of a wife and children. On the contrary, having domestics or servants was considered as equally entitling the applicant to the grant."

In Babb v. Carroll, 21 Texas, 765, it was held, that a land certificate, and land granted by virtue of it, belonged to a man and woman in equal parts, when granted to him because of the apparent family relation existing between them by reason of their living together as man and wife, although such was not their relation.

These cases are relied upon by appellee for the purpose of showing that grants for a league and labor of land were made on account of the existence of a family consisting of persons other than husband and wife, and in addition to them our attention is called to the following brief extract from the "Letters of an Early Settler of Texas," page 49, published in 1858, and dated November 5, 1827, by W. B. Dewees:

"You inquire of me, how much land is granted to each man? To every married man is granted one league and labor of land, which contains 4621 acres; and each single man is allowed one-quarter of a league, which contains 1111 acres. The difference between the Mexican and American measurement is this: in the Mexican measurement one-eighth per cent is taken off from the American chains. Fortunately for us young men who are here at this time, Austin, fearing that there would not be found three hundred families in the colony within the given time for his fulfilling his contract, lest he should lose his grant, informs us, that if we would locate ourselves together as families, each family consisting of two members, calling one the head, he would grant to each family a league and labor of land. But I must not forget to men-

tion, that every single man who receives land under the Mexican government, on marrying is entitled to an augmentation of his claim to a league and labor of land.

" While we were busy locating our lands, tidings came that our settlement was likely to be invaded by the Carancoway Indians. Each of us immediately left our work unfinished, and armed ourselves in hot haste to protect the defenseless women and children."

The writer of this seems to have been one of the original " three hundred " introduced under the contract made prior to the colonization law of March 24, 1825, and probably has the action of the empresario under that contract in mind; but his letters, written in 1827, in many respects have reference directly to the subsequent law, and if that law was construed as the writer evidently understood, it would be difficult to hold that it was then understood to give a league and labor to any other family than such as was composed of husband and wife, and the inference would be that such grants made to a number of single or unmarried men were evasions of the law.

It may be conceded, that grants for a league and labor of land were lawfully made to men or women who were the heads of families composed of themselves and children or servants; and we may even go further, although there is no decision to authorize it, and concede that under the colonization law of March 24, 1825, such grants were made to two or more single men as one family, but that would but show that families, within the meaning of the law, might exist without marriage.

With this concession the fact would still remain, that such a grant might legally issue to a family composed of husband and wife, and that when so issued the land would be community property; and in view of the law, which so often refers to marriage as the basis of the family contemplated by it—dividing the beneficiaries into two classes, " unmarried men " and " single men " in one, " families " in the other—and of the provision which on marriage increased the quantity which one of the first class became entitled to, and in view of the popular meaning constantly given to the word family, we can not doubt that the land certificate and the conveyances through which appellee claims were sufficient to put every person claiming through a conveyance from Richard R. Jowell upon inquiry whether or not he was a married man when the right to the land accrued and when the certificate issued. The certificate gave notice to all persons that persons other than the original grantee might have an interest in it, and that it could not have legally issued to him but for his relation to some other person.

This being true, appellee and those through whom she claims stand charged with notice of the fact that the certificate was community property of Richard Jowell and his wife, of her death, of the existence of the child of the marriage, and of every other fact necessary to protect appel-

lants against appellee's claim that persons through whom she claims were innocent purchasers, in the absence of evidence showing that such inquiry as a prudent man ought to make failed to develop the facts as they are conceded to have existed.

The rule is understood to be as thus stated by a writer of recognized learning and accuracy: " Whenever, therefore, a party has merely received information, or has knowledge of such facts sufficient to put him on inquiry, and this constitutes the sole foundation for inferring a constructive notice, he is allowed to rebut the prima facie presumption thus arising by evidence; and if he shows by convincing evidence that he did make the inquiry, and did prosecute it with all the care and diligence of a reasonably prudent man, and that he failed to discover the existence of, or to obtain knowledge of, any conflicting claim, interest, or right, then the presumption of knowledge which had arisen against him will be completely overcome; the information of facts and circumstances which he had received will not amount to constructive notice. What will amount to due inquiry, must largely depend upon the circumstances of each case. If, on the other hand, he fail to make any inquiry, or to prosecute one with due diligence to the end, the presumption remains operative, and the conclusion of a notice is absolute." 2 Pome. Eq., 607.

The conveyances in this case pointed out sources from which information as to the right of the mother of appellants might have been obtained, and there can be no inference or presumption that it would not have been if due inquiry had been made.

We have not the conclusions of fact or law on which the court based its judgment, but under the conceded facts, and in the absence of all testimony tending to show that proper inquiry was made as to the rights of others than R. R. Jowell in the certificate, it could not have been based on any other conclusion than that the facts of which the purchasers had information were not sufficient to put them on inquiry, and this can not be sustained.

Appellants were entitled to a judgment on the conceded facts; but in view of equities which manifestly may exist, and of the absence of evidence which the parties may be able to produce that will enable the court to adjust all equities between them, we deem it best to reverse the judgment and remand the cause, that the parties may have opportunity to do this.

We deem it proper, however, in view of further proceedings, to suggest what now seem to us the equities of the parties.

The husband of appellee was the owner of one-half of the certificate for one league, but he seems not to have acquired any interest in the labor included in the certificate; but after the land in controversy was patented a certificate for the unlocated balance was delivered to him. This certificate called for 4,613,000 square varas of land, and the record

does not show whether land was acquired by it or whether it was sold to some other person.

As the husband of appellee and those through whom he acquired right located and caused the land in controversy to be patented under claim of right to the whole, then if no use was made by the husband of appellee of the certificate for unlocated balance, appellee ought to be permitted to have one-half of a league of the land in controversy and appellants the remainder.

If, however, land was acquired by the husband of appellee by virtue of the certificate for unlocated balance, it would not be just to require her to receive all the land to which she may be entitled out of the tract in controversy, for that acquired by virtue of the certificate for unlocated balance may be more valuable.

If the husband of appellee acquired land by virtue of the entire certificate for one league and labor, then the rights of the parties ought to be adjusted with reference to all the land so acquired. If he acquired no land by virtue of the certificate for unlocated balance, but did dispose of that certificate, then appellee ought to recover only one-half of the land in controversy.

Looking to the relation of the parties to the land and to the certificate by virtue of which it was acquired, we are of opinion that appellee will be entitled to the reasonable cost of procuring title to so much of the land as appellants may receive, with interest thereon from the time title was obtained; and, in addition to this, will be entitled to recover the sum paid as taxes on the lands appellants receive, with interest on same from the time the several payments may have been made.

It is ordered that the judgment be reversed and the cause remanded.

*Reversed and remanded.*

Delivered March 4, 1892.

[This case did not reach the Reporter with the Galveston records.]