## WESTERN UNION BEEF CO. v. THURMAN et al.

(Circuit Court of Appeals, Fifth Circuit. December 3, 1895.)

### No. 391.

1. EVIDENCE—DOCUMENTS IN CONTROL OF ADVERSE PARTY—ATTORNEY AND CLIENT.

For the purpose of showing that one P. was chief counsel for the plaintiffs in an action on trial, and accordingly that the plaintiffs were bound, upon notice, to produce certain deeds, alleged to be in P.'s possession, defendant introduced evidence to the effect that the attorney of record in the case was one M., but one B. conducted the case; that B. believed that P. had employed M. to bring the action; that he had had some correspondence with P. about the case, and on one occasion, when defendant's attorneys requested a continuance, he referred them to P., and agreed to respect his decision; and that P. assented to the continuance. The trial judge held this evidence insufficient to show that P. so far controlled the case that his possession of the deeds should be treated as that of the plaintiffs. *Held* no error.

2. ADVERSE POSSESSION—EVIDENCE.

In an action of ejectment, defendant, claiming under a title by alleged adverse possession for 10 years for the purpose of showing such possession in one K. and under his title, introduced evidence showing that one F. went into possession of the land for K. on October 19, 1868, held it for him until his death, in 1878 or 1879, and thereafter, until 1885, for two sisters of K., who were supposed to be his heirs, but in fact were not such. The trial court held that as the adverse holding under K.'s title was interrupted after his death by the holding for others, not in privity with his title, there was no sufficient evidence of adverse possession to go to the jury. *Held* no error.

3. EVIDENCE—HEIRSHIP—TEXAS LAND LAWS.

The fact that a patent, issued under the land laws of Texas, was for the quantity of land to which, under such laws, a single man was entitled, being less than that which a married man would receive, does not prove that the person to whom the grant was made was single, since the provision of the law for the benefit of married men did not necessarily apply to men who went to Texas without their families; nor does the fact that such a patent is issued, after the death of the person to whom the grant was made, to one who is recited to be his "natural heir," prove that such natural heir was an illegitimate son, or that the grantee was unmarried.

4. SAME—IMPROVEMENTS—TEXAS STATUTE.

In an action of ejectment, evidence in support of a defendant's plea for improvements, which fails to show the value of the improvements at the time of the trial, or the enhanced value of the land by reason thereof, or the value of the land without them, is insufficient to warrant a submission to the jury, under Rev. St. Tex. art. 4814.

5. SAME—LETTERS OF PRESIDENT OF CORPORATION.

It is not reversible error to admit, as against a corporation, letters purporting to emanate from such corporation, signed by its president, and relating to matters in issue, though there is no direct proof of the president's authority to write them, especially when there is nothing in the letters to prejudice the corporation's case.

6. FEDERAL COURTS—JURISDICTION—DISTRICT OF RESIDENCE OF PARTIES.

The objection that neither party to a cause in a United States circuit court is a resident of the district in which it was brought cannot be first raised in the appellate court, it appearing that diverse citizenship existed, and that the action was to recover lands in the district where it was brought.

In Error to the Circuit Court of the United States for the Western District of Texas.

Miles B. Thurman and Joseph B. Thurman, resident citizens, respectively, of the states of Illinois and Kansas, brought their action in the United States circuit court for the Western district of Texas, against the Western Union Beef Company, a corporation organized under the laws of the state of Colorado, having its principal office in the city of Denver, Colo., and a local agency in San Antonio, Bexar county, Tex., to recover one-third of a league of land in Pecos county, Tex., said to be worth the sum of $7,500, and damages for detention. The Western Union Beef Company entered an appearance, and in due course filed an amended original answer, containing a general demurrer, and pleas of not guilty, the statutes of limitation of 5 and 10 years, possession in good faith and improvements made; and, on the issues made by this answer, the case was tried. The evidence bearing on each of the several issues involved, though voluminous, was neither conflicting nor disputed. The jury, under the direction of the court, returned a verdict for the plaintiffs, whereupon the judgment of the court was entered adjudging the land to them with the costs of the court. The Western Union Beef Company, the defendant, filed its motion for a new trial, which being overruled, sued out and prosecutes this writ of error. The facts in the case are sufficiently shown in the opinion of the court.

Thos. H. Franklin and T. D. Cobbs, for plaintiff in error.

W. B. Brack, for defendants in error.

Before PARDEE and McCORMICK, Circuit Judges, and BOARMAN, District Judge.

PARDEE, Circuit Judge. The first and second assignments of error are to the effect that the court erred in refusing to allow the defendant in the court below to introduce in evidence, in the absence of the originals, certified copies of certain deeds, for the purpose of showing an outstanding title to one-half of the land in controversy. The contention with regard to this matter is that the original deeds were in the possession of the plaintiffs and their counsel of record, who, after due notice, had neglected and refused to produce them. It was claimed that they were in the possession of the plaintiffs because one J. C. Patton, who was the grantee in one of the deeds and the grantor in the other, was chief counsel for the plaintiffs. The evidence on the subject is as follows: Defendant introduced in evidence the petition which was filed in court on the 29th day of December, 1891, to show who was signed as attorneys of record thereto. The petition was signed by S. C. McCormick alone, but W. B. Brack was attorney who represented plaintiffs in the trial and conduct of the case. W. B. Brack, being duly sworn, stated that he was employed in the case by S. C. McCormick, who signed the petition. He stated that from correspondence with McCormick within the last six months, no doubt J. C. Patton employed S. C. McCormick, and gave him an interest in the land for his fee to bring the suit, but that he (Brack) was employed in the suit by McCormick, and not by Patton; that McCormick filed the petition; that he (Brack) did not have the original deed in his possession, and never saw it; that neither Patton nor McCormick was present at this term of the court; that in September, 1894, Patton wrote to him inquiring about the suit, and that this was his first and only communication from him; that about this time he got a letter from Denman & Franklin, defendant's attorneys at San Antonio, who wanted to continue the case, and as he had continued

the case so often, and there was some misunderstanding between him and McCormick about the fee, he was not willing to consent to a continuance, but told Mr. Kemp, one of defendant's attorneys, that, if Denman & Franklin would telegraph Patton, he would respect any agreement for a continuance that Patton would make; that thereupon Davis, Beall & Kemp, defendant's attorneys at El Paso, telegraphed Denman & Franklin on September 27, 1894, as follows: "Brack says James C. Patton, attorney, 235 Main street, Dallas, is his chief, and expects to be here Monday, but wire him, and whatever he says will be respected." The witness stated that he recognized the dispatch as the one sent to Denman & Franklin, and explained that the word "chief" in it was not in reference to any contract relation between him and Patton, because there never was any, nor did he represent him. The defendant then offered in evidence the following telegram from J. C. Patton to Thomas H. Franklin, of Denman & Franklin: "I hereby agree to continuance of case Thurman against beef company." On this evidence, the trial judge, without assigning specific reasons therefor, refused to allow the certified copies to be read in evidence, but we take it that the refusal was because the evidence did not sufficiently show that Patton was counsel for the plaintiffs, or controlled the case for them to such an extent that his possession, even if he had the originals, could be treated as the possession of the plaintiffs; and, of course, the plaintiffs were not required to produce any originals or other deeds not in their hands or under their control. The plaintiff in error submits, in support of these assignments, 1 Greenl. Ev. § 572; Dean v. Border, 15 Tex. 299. These authorities declare the rule as to copies where the original documents wanted in evidence are within the hands or power of the adverse party.

The third assignment of error is that the court erred in not submitting to the jury the question of limitation under defendant's plea of 10 years, because the proof was sufficient to raise the issue, so that the same ought to have been submitted to the jury. The substance of the proof on said issue was that one George M. Martin conveyed all the land in controversy to W. B. Knox, by a deed dated March 1, 1866, which deed was duly acknowledged and filed for record and recorded on July 14, 1866; also a deed from Martha Knox and Annie E. Knox, conveying to the Western Union Beef Company an undivided one-half interest in and to the lands sued for, authorizing said company to take and hold possession of the entire tract of land, which deed was dated March 29, 1894. The proof further showed that one G. N. Frazier went into possession of the lands sued for on the 19th day of October, 1868; that he took possession of the same for W. B. Knox, and made improvements thereon; that he remained in possession until September, 1885, holding possession for W. B. Knox from the time of his original entry up to the death of Knox, about 1878 or 1879, and thereafter holding possession for the sisters of Knox, Martha Knox and one Mrs. Davis, supposed by him to be the heirs of Knox. After the death of Knox, Frazier rendered the property for taxation, and paid the taxes for and in the name of the sisters. The sisters of Knox were

not his heirs, but his heirs were his adopted daughter, Annie E. Knox, and his surviving wife, afterwards a Mrs. Eckford.

It is not necessary to recapitulate more of the evidence, as this testimony of Frazier was undisputed, and presents the exact question which is raised by the assignment of error. This evidence does not show continued adverse possession of 10 years in W. B. Knox and for his heirs, but that the same was interrupted by the death of Knox, because Frazier held thereafter for the sisters of Knox, who were not his heirs, and were not in privity with the Knox title. The plaintiff in error contends that the possession of Frazier for Knox was continued for his heirs, and that as a matter of law, on the evidence, the possession of Frazier from the time he entered, in 1868, until he left the property, in 1885, was one continued adverse holding. The defendants in error contend that the possession of Frazier after the death of Knox, being for the sisters, and not the heirs, of Knox, was adverse to Knox's title, and properly defeats the plea of 10 years' limitation; the result being exactly the same as if Knox had held in his own right until 1878 or 1879, and from there on Mrs. Davis and Martha Knox had possessed in their own right, but not in privity with Knox. No presumption should be resorted to, to help out the possession by which a trespasser acquires title against the true owner; but whoever claims under the statute, should bring himself clearly within the terms of the law, and show that his possession was continuous and adverse— the same flag flying—for the whole period named.

In this matter we have examined the following authorities, cited by counsel for the plaintiff in error: Gresham v. Chambers, 80 Tex. 544, 16 S. W. 326; Craig v. Cartwright, 65 Tex. 422; Moody v. Holcomb, 26 Tex. 719; Bridges v. Johnson, 69 Tex. 717, 7 S. W. 506; Mims v. Rafel, 73 Tex. 303, 11 S. W. 277; Branch v. Baker, 70 Tex. 194, 7 S. W. 808; Ballard v. Carmichael, 83 Tex. 366, 18 S. W. 734; Smithwick v. Andrews, 24 Tex. 488; Baily v. Trammell, 27 Tex. 317. But we find none of them bearing upon the precise point in this case, which is, as a question of law, under the evidence of Frazier, was the possession of the property under the Knox title continuous and adverse from 1868 to 1885? After careful consideration, we are not able to say that the trial judge, with the witnesses before him, erred in his conclusion of law on this branch of the case.

The fourth assignment of error is that the court erred in refusing to submit to the jury the question whether or not the plaintiffs in said action were the heirs of Fleming G. Thurman, to whom the land was patented. The proof on the subject is as follows:

"Be it remembered that, on the trial of said cause, the plaintiff introduced in evidence the certified copy of the patent from the state of Texas for the land sued for, dated 28th day of January, 1862; the recitals in the body of said patent describing certificate No. 193 as follows: 'Issued by the board of land commissioners of Fayette county on the 13th of January, 1840, to Fleming G. Thurman, natural heir of Geo. C. Thurman.'"

The only proof of heirship submitted by plaintiffs is the deposition of Joseph B. Thurman, which was taken March 18, 1892, and is as follows:

"I reside in Columbus, Cherokee county, Kansas; have resided there twenty-one years; and now reside there. My place of residence must be near 1,800 miles from El Paso, Texas. I am 58 years old. My health is very poor; got no strength to walk alone. My state of health and strength is not such as to permit me to attend court at El Paso. I am one of the plaintiffs in this suit, and I am a brother of the other plaintiff. He lives in the state of Illinois, at Jefferson county. His age is 74. His post-office address is Mt. Vernon. I am a grandson of George C. Thurman, and he is my grandfather. He is now dead. He lived in Texas, and died near Lynchburg, Va. I know that he lived in Texas, but I don't know how long he lived there, but I think it was in the year 1833. I know that he received a land warrant from said republic or state, and that he is the said George C. Thurman mentioned in said patent. The said George C. Thurman was married. They had three children, one girl and two boys. The boys' names were Fleming and Thomas Thurman; the girl's name was Susan. These children are all dead. The two boys were both married. The girl died when young, in childhood. Thomas Thurman left no issue. Fleming Thurman left myself and my coplaintiff, Miles B. Thurman. There were other children born to Fleming Thurman, but died when they were young. Myself and my coplaintiff are all the descendants of George C. Thurman now living. The wife of George C. Thurman is dead, and the wives of all the descendants except my wife and my coplaintiff are now dead. I knew and was acquainted with some of the descendants of George C. Thurman,—my father, Fleming C. Thurman, and Thomas Thurman, and Susan Thurman, and my coplaintiff, Miles B. Thurman. Thomas Thurman died without issue. Susan Thurman died in childhood. Fleming G. Thurman died in 1857, leaving myself and my coplaintiff as heirs,—I residing in Columbus, Cherokee county, Kansas; my brother in Jefferson county, Illinois. Miles B. Thurman or Joseph B. Thurman never sold, disposed, or conveyed any interest in any land they may have had in Pecos county, Texas, or ever executed any contract or conveyance or instrument of any kind in regard to same."

The defendant introduced in evidence the original patent, dated 28th day of January, 1862, which came from the defendant's possession, and describing the survey 160, which is the land sued for, with the following recital in the patent, to wit:

"By virtue of certificate No. 193, issued by the board of land commissioners of Fayette county on the 13th day of January, 1840, to Fleming B. Thurman, natural heir of George C. Thurman."

The plaintiff in error contends that this evidence does not sufficiently identify the defendants in error as heirs of George C. Thurman. The argument is that, under the law of Texas, married men were entitled to a league and labor of land, and a single man was entitled to one-third of a league of land, or 1,476 acres. The grant of the state, it is said, shows that George C. Thurman, to whom the certificate was granted, was a single man, because, had he been a married man, he would have been entitled to a league and labor, instead of to one-third of a league; and that, under the law, no grant for 1,476 acres as a headright could be granted to George C. Thurman, unless George C. Thurman be a single man. It is further argued that George C. Thurman must have been a single man from the fact that the language of the patent is that the same was issued to Fleming G. Thurman, natural heir of George C. Thurman; that Fleming G. Thurman, under whom the defendants in error claimed, was born in lawful wedlock; that the proof shows that Fleming G. Thurman, under whom defendants in error claim, was one of the legitimate children of George C. Thurman, born in lawful wedlock; that the patent shows that the certificate, as stated, was issued to

Fleming G. Thurman, natural heir of George C. Thurman, which means that Fleming G. Thurman was not the natural heir of George C. Thurman, unless he was born out of lawful wedlock; that if the certificate was intended to be granted to Fleming G. Thurman, the father of the defendants in error, then the recital in the patent would be false in two particulars: First, that it could not have been granted, for the reason that the George C. Thurman mentioned was a married man, and he would have been entitled to a league and labor of land instead of to one-third of a league; second, it could not be to the Fleming G. Thurman, the father of the defendants in error, because the father of Fleming G. Thurman was shown to have been a married man, and had as issue of his marriage three children, one of whom was Fleming G. Thurman, and therefore the certificate would be false in stating that Fleming G. Thurman was the natural heir of George C. Thurman. This is very ingenious, but not very convincing. We do not think it follows that the words "natural heir," in the patent, meant illegitimate son. If Fleming G. Thurman had been a bastard, he could not have inherited from his father, and the certificate could not have been issued to him. It does not follow that because the grandfather, George C. Thurman, was married, a certificate for a league and labor of land would have been issued to him, and that, therefore, the grandfather of the defendants in error could not have been the father of the patentee. The record does not show under what law the said George C. Thurman became entitled to a patent for land. An examination of Grooms v. State, 1 Tex 573; Republic v. Skidmore, 2 Tex. 265; Tichner v. State, 2 Tex. 269,—will show that the terms "married" and "head of the family" do not necessarily apply to those married men who went to Texas without their families. While the proof in this case shows that George C. Thurman was a married man, it does not show that he was domiciled in Texas with his family, but inferentially that his family remained in Virginia.

The fifth assignment of error is that the court erred in not submitting to the jury the issue in support of the defendant's plea for improvements. The proof on the subject consists of the evidence of one N. T. Wilson, who testifies as follows:

"I reside in San Antonio. I know the defendant, the Western Union Beef Company. I am superintendent of that company in Texas. I know the property that is in controversy. There are not any improvements on the property now, except these old adobe houses and a portion of an irrigating ditch. These improvements were on there when we went there, and are on there now. The ditch is between seven and eight miles long. That ditch is of value. I don't know how much it cost to dig it, because I haven't any experience in that, but I should think it would cost three or four thousand dollars to dig it. Only a small portion of the ditch is on the land in controversy; couldn't be over a quarter of a mile; I don't know that there is that much. That part would be worth four or five hundred dollars to dig the ditch. There is a deep cut below there, which is the costliest part of the ditch. There is a dam. It is a rock and timber dam; just rock hauled and filled in there, not cut stone or masonry or anything of that kind; the rock just thrown in loosely, and timber driven in above it, like piles, and dirt on that. The dam is used for throwing the water in this ditch for irrigation, and we run the water to the end of the ditch five or six miles to water the cattle. I don't know what the dam is worth, but I should think it would cost at least five hundred dollars

to build the dam, probably more. That is a thing that I could not tell anything about. Never built any, and could not tell the actual cost. It is across the creek, and must be seventy-five or one hundred feet long. There are no fences on this land in controversy, except some that has been put there the last three years, since this suit was filed. Before that time there were the adobe houses, the ditch, and the dam; that is all. We made no use of the premises, except we kept a man there renting it all the time. We had a blacksmith's shop there, rented to a man. I have tax receipts showing that taxes were paid on the property in 1887 and 1888. I think it is. When this suit was instituted, we had an abstract made of it. The first taxes I paid personally was in 1891. Presnall and Mussey paid the taxes between 1889 and 1891, for the Western Union Beef Company. I know that, because they show to be paid on the tax rolls of the county. I had tax rolls examined. I never saw it. This ditch was not built for the purpose of irrigating this land; it was for the convenience of some other parties owning land below there. The Western Union Beef Company owns the land below there now. The ditch was built for the purpose of irrigating those lands below, and is used for that purpose now. The Western Union Beef Company maintains it, and keeps it improved. That cut or gap is on the east of the dam. It is nearly a mile. It is off of this land. The whole ditch is seven or eight miles long. I don't know what it cost. It cost five hundred dollars to clean it out. The costly part was on other land. Only about a quarter of a mile ran on this land. The ditch is six or eight feet wide at the bottom. It varies according to the depth of the cut. I think it is six or eight feet at the bottom."

This proof was wholly insufficient to warrant a submission to the jury, because it did not show the value of the improvements at the time of the trial, nor the enhanced value of the land by reason of the improvements, nor the value of the premises without the improvements. Rev. St. Tex. art. 4814.

The sixth assignment of error is that the court erred in allowing the admission of two several letters directed to S. C. McCormick, of Dallas, Tex., one dated November 12, 1891, the other dated November 27, 1891, signed by G. M. McGhee, president of the Western Union Beef Company, because it was not shown that the said McGhee was authorized or had the power to bind the said company by any declaration such as was contained in the said letters, and because the letters were written beyond the scope of the authority of the said president, and were therefore absolutely unauthorized. The bill of exceptions on the subject shows that the letters were admitted to be letters of the president of the Western Union Beef Company, and related to the title to the lands involved, claimed by said company; but, otherwise than as appears on the face of the letters, it is not shown that they were written by authority of the company. We take it that as the letters purported to emanate from the Western Union Beef Company, and were signed by its president, no reversible error was committed in allowing the introduction of the same in evidence; particularly as there is nothing in the contents of either of the letters calculated to prejudice in any respect the title of the defendants in error. This being the case, we do not consider it necessary to discuss the proposition as to how far a corporation may be bound by the declarations of its president, who generally acts as agent of the corporation in all its business.

The seventh assignment of error raises the question of the jurisdiction of the court on the ground that neither of the parties are resident citizens of the Western district of Texas. As this ques-

tion is raised for the first time in this court, and as the record shows that the parties plaintiff in the court below are citizens of different states from the defendant, and as the suit is one to recover lands situated in the Western district of Texas, wherein the parties appeared without objection and submitted their proofs, we do not think it necessary to further consider the matter.

The eighth and last assignment of error is a general one, and need not be considered.

The judgment of the circuit court is affirmed.